A96A2369. UDM TECHNOLOGY, INC. et al. v. STERLING SOFTWARE (SOUTHERN), INC.
(484 SE2d 3)

BLACKBURN, Judge.

UDM Technology, Inc., Joseph Flaherty, Jr., and Michael Attell (collectively, UDM) appeal the grant of summary judgment to Sterling Software (Southern), Inc. (Sterling) on UDM's claim for royalties due under an agreement for the sale of software technology. UDM claims the trial court erred in finding that there were no genuine issues of material fact regarding its entitlement to certain royalties.

In 1991, UDM and Sterling entered into a purchase agreement pursuant to which UDM sold certain software technology it had invented to Sterling. As part of the consideration for such sale, Sterling agreed to pay royalties to UDM on net revenues generated from commercial licenses of software products developed from the UDM technology. The only product actually developed and marketed by Sterling using the UDM technology was a software product known as CWS/GUI.

UDM sued Sterling for its alleged failure to pay all royalties due under the agreement, and appeals the trial court's grant of summary judgment in favor of Sterling.

1. For a fee, Sterling would often enter into maintenance contracts with customers purchasing its software products. These main-

tenance contracts provided that, among other things, the customers would be entitled to receive upgrades or enhancements of the CWS/GUI product at no extra charge. UDM argues that a factual dispute exists regarding its entitlement to royalties on revenues generated by such maintenance contracts.

The purchase agreement provided that "maintenance fees" were to be excluded from net revenues in calculating royalties, but did not define the term "maintenance fees." UDM argues that such term was not intended to include revenues from the provision of product upgrades, and that it is entitled to royalties on such revenues even if the upgrades are provided pursuant to a maintenance contract. Sterling, however, argues that "maintenance" is a technical term understood in the industry to include the provision of product upgrades, and that UDM is thus not entitled to royalties on any portion of the revenues Sterling receives from its maintenance contracts.

In the construction of a contract, the cardinal rule is to ascertain the intention of the parties. *McVay v. Anderson*, 221 Ga. 381, 385 (144 SE2d 741) (1965). "The construction of a contract is a question of law for the court. Where any matter of fact is involved, the jury should find the fact." OCGA § 13-2-1. "Construction of ambiguous contracts is the duty of the court, and no jury question is raised unless after application of the pertinent rules of construction the ambiguity remains." *Erquitt v. Solomon*, 135 Ga. App. 502, 503 (218 SE2d 172) (1975). However, if the court cannot resolve the ambiguity by application of the pertinent rules of construction, the intention of the parties is a question for the jury. *U. S. Enterprises v. Mikado Custom Tailors*, 250 Ga. 415, 416 (297 SE2d 290) (1982); *Williams v. McCoy Lumber Indus.*, 146 Ga. App. 380, 382-383 (246 SE2d 410) (1978).

At issue in the present case is the rule of construction that "[w]ords generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning." OCGA § 13-2-2 (2).

In support of its argument that "maintenance" is a technical term understood in the industry to include the provision of product upgrades, Sterling presented the affidavit of Chelton D. Tanger, an employee of the accounting firm Coopers & Lybrand (Coopers). Tanger stated that he was often involved in reviewing software license agreements to be entered into by Coopers, and that, in each such instance, Coopers entered into a maintenance agreement with the software vendor providing that Coopers would receive software upgrades. However, this testimony is limited to maintenance agreements negotiated and entered into by one company, and thus does not establish trade usage. Furthermore, this testimony at most

establishes that the obligation to provide product enhancements is often bargained for and included in maintenance agreements, not that the term "maintenance," standing alone, has a trade meaning which includes such obligation.

Attached to Tanger's affidavit is a copy of Statement of Position 91-1 issued by the American Institute of Certified Public Accountants (SOP 91-1), dealing with software revenue recognition. Tanger relied on this document to establish the trade meaning of the term "maintenance." However, SOP 91-1 was not issued until after the purchase agreement was executed, and was actually issued in an attempt to bring consistency to varied accounting practices for software revenue recognition. Furthermore, SOP 91-1 uses the term "postcontract customer support" rather than "maintenance," noting that "[the term 'maintenance'] may be confused with hardware maintenance . . . , and its meaning varies from company to company." Accordingly, SOP 91-1 does not establish as a matter of law that the term "maintenance" had a commonly understood meaning in the industry at the time the purchase agreement was entered into.

In addition, one of Sterling's employees testified that software companies deal differently with the issue of whether product enhancements are to be included in a maintenance price or whether they are to be charged separately. He suggested this could depend on whether the upgrades are minor changes to address software problems or are major enhancements.

The evidence of record thus does not establish as a matter of law that, at the time the purchase agreement was entered into, the term "maintenance" was a technical term commonly understood in the industry as including the obligation to provide software upgrades. Thus, there is a genuine dispute as to the intent of the parties in using the term "maintenance," and this Court is unable to resolve the dispute by application of rules of construction. Accordingly, the parties' intent is a question for the jury, and the trial court erred by holding as a matter of law that all revenues derived from Sterling's maintenance contracts are excluded from net revenues in the calculation of royalties due UDM. See *Williams*, supra at 382-383 (2).

2. UDM also argues that the trial court erred in failing to find a factual dispute regarding its entitlement to royalties on "master" or "site" license agreements, an arrangement in which the CWS/GUI product was packaged with other software products and licensed to customers for a flat fee.

The purchase agreement provides that UDM is entitled to royalties on all net revenues "actually received by [Sterling] from commercial licenses of the Developed Product(s) [i.e., products developed from the UDM technology] to end users." However, the agreement is silent as to how to calculate the revenue attributable to the CWS/

GUI product when it is licensed to customers for a flat fee as part of a package containing other software products. UDM argued before the trial court that it was entitled to royalties based upon the entire package price. In support of this position, UDM pointed to a provision in the agreement providing that Sterling had the authority "to offer the Developed Product(s) separately and/or in combination with other [Sterling] materials or products." Because the agreement anticipated the licensing of developed products in packages with other products, but did not provide a way to apportion the revenues received among the various products, UDM asserted that it was entitled to royalties on the entire package price.

Sterling, however, urged the trial court to adopt a process for calculating royalties based on the amount a customer actually used the CWS/GUI product. Under this proposal, Sterling would survey its customers 18 months after they purchased software packages to determine how often the customers used CWS/GUI as opposed to other products. The royalties owed to UDM would then be calculated based on the actual usage of CWS/GUI by the customers.

In its order granting summary judgment to Sterling, the trial court found that "apportionment of the revenue attributable to the software technology at issue [is] appropriate. The Court further finds the . . . royalty calculation method proposed by [Sterling] is an appropriate method for the calculation of royalties owed to the Plaintiff from revenues generated by the master license arrangements."

The trial court correctly found that the purchase agreement requires apportionment of revenue derived from package sales into revenue attributable to CWS/GUI (on which royalties must be paid) and revenue attributable to other products. UDM's argument that it is entitled to royalties on all revenues generated from package sales is unreasonable, as the agreement clearly defines net revenues as revenues received by Sterling from commercial licenses "of the Developed Product(s)." Therefore, it is clear that the agreement requires some form of apportionment of package sale revenues.

However, the trial court erred in adopting the royalty calculation method proposed by Sterling. In construing a contract, the court is required to ascertain the intent of the parties. *McVay*, supra. The proposal urged by Sterling is clearly not based on an interpretation of the parties' intent, but on an evaluation of what would constitute a fair settlement of the parties' dispute. The agreement clearly contemplated that UDM's royalties would be based on the revenue *received by Sterling*, not on the amount a customer used the product. The revenue received by Sterling does not depend on the amount a customer uses a product. Accordingly, basing UDM's royalties on the amount of customer usage clearly does not effectuate the intent of the parties as expressed in the Agreement. See *Brigadier Indus. Corp. v. Pippin*,

148 Ga. App. 145, 146 (251 SE2d 114) (1978) ("courts are not at liberty to revise contracts while professing to construe them"). Thus, the trial court erred in adopting the construction of the agreement urged by Sterling.

Although the agreement clearly requires some form of apportionment of revenues from package sales, it is ambiguous as to exactly how such revenue is to be apportioned. The evidence presented does not allow this Court to resolve this ambiguity as a matter of law. Accordingly, the proper apportionment of revenue is a question for the jury, and the trial court erred in granting summary judgment to Sterling.

*Judgment reversed. Birdsong, P. J., and Beasley, J., concur.*

DECIDED FEBRUARY 17, 1997 —
RECONSIDERATION DENIED MARCH 13, 1997 — ▉▉▉▉▉▉▉▉

*Stowers, Hayes, Clark & Roane, E. Hearst Roane, Jr., Casey, Gilson & Williams, Matthew H. Roane,* for appellants.
*Hicks, Maloof & Campbell, Henry F. Sewell, Jr., David N. Bryman,* for appellee.

