986 So.2d 411 (2006)
WILBANKS HEALTH CARE SERVICES, INC., d/b/a Sylacauga Health Care Center
v.
ALABAMA MEDICAID AGENCY.
2050132.
Court of Civil Appeals of Alabama.
October 20, 2006.
*412 David M. Hunt and Susan V. Simpson of Johnston Barton Proctor & Powell, LLP, Birmingham, for appellant.
*413 Troy King, atty. gen., and William O. Butler III, deputy atty. gen., for appellee Alabama Medicaid Agency.
CRAWLEY, Presiding Judge.
Wilbanks Health Care Services, Inc., d/b/a Sylacauga Health Care Center, a nursing home in Sylacauga (hereinafter referred to as "the nursing home"), appeals from a judgment of the Montgomery Circuit Court affirming a decision by the Alabama Medicaid Agency ("the Agency") to deny reimbursement for certain fees related to the nursing home's purchase and use of computer software.
In September 2001, the nursing home entered into a "Purchase and License Agreement" ("the purchase agreement") to buy computer hardware and software from American HealthTech, Inc. ("AHT"), a software developer for the long-term-care industry. The software was composed of different "modules." For example, a clinical module enabled the nursing home to generate care plans for residents; a billing module allowed the facility to submit electronic bills to agencies such as Medicare and Medicaid as well as to private insurers. The purchase agreement included two types of "software maintenance fees": an hourly fee for on-site and telephone support and a fixed "monthly maintenance fee."
AHT charged the hourly "maintenance fee" for user-initiated maintenancethat is, when, in response to a request by the user, an AHT technician either came to the user's premises or provided the user with telephone consultation to address a computer-software problem. On the other hand, AHT charged a set "monthly maintenance fee" for vendor-initiated maintenancethat is, a fee attributable to the service provided to all users when AHT programmers made periodic updates to the software to enable it to function properly.
The nursing home reported both types of "maintenance fees" as operating expenses, or costs, for which it sought reimbursement on its annual Medicaid cost report. The Agency allowed reimbursement for the hourly maintenance fees, but it denied reimbursement for the monthly maintenance fees. It took the position that the monthly maintenance fee was, in reality, a licensing feea part of the purchase price of the software and, thus, a capital expenditure[1] rather than an operating expense.[2]
Upon the denial of reimbursement, the nursing home requested a fair hearing. Following an ore tenus proceeding on November 17, 2004, the fair-hearing officer issued findings of fact, conclusions of law, and recommendations to the commissioner of the Agency. On February 15, 2005, the commissioner adopted the fair-hearing officer's recommendation and entered a final decision denying reimbursement to the nursing home. The nursing home filed a timely petition for review in the Montgomery Circuit Court. On October 3, 2005, the circuit court affirmed the commissioner's decision, and the nursing home timely appealed to this court. The issue on appeal is whether the Agency's decision to treat the monthly maintenance fee as a capital expenditure rather than an operating expense was clearly erroneous, unreasonable, or arbitrary and capricious.

Standard of Review
This court reviews the circuit court's ruling with no presumption of correctness, *414 "since that court was in no better position to review the order of the [Agency] than we are." State Health Planning & Resource Dev. Admin. v. Rivendell of Alabama, Inc., 469 So.2d 613, 614 (Ala.Civ. App.1985).
"Judicial review of the Agency's determination regarding reimbursement is quite limited under the AAPA [Alabama Administrative Procedure Act]. Ala. Code (1975), § 41-22-20(k), provides that the Agency's order is to be taken as prima facie just and reasonable. The circuit court may not substitute its judgment for that of the Agency as to the weight of the evidence. Moreover, the circuit court may reverse the Agency's decision only if substantial rights of [the nursing home] have been prejudiced because the [A]gency action is:
"`(1) In violation of constitutional or statutory provisions;
"`(2) In excess of the statutory authority of the agency;
"`(3) In violation of any pertinent agency rule;
"`(4) Made upon unlawful procedure;
"`(5) Affected by other error of law;
"`(6) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
"`(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.'"
Alabama Medicaid Agency v. Beverly Enters., 521 So.2d 1329, 1331 (Ala.Civ.App. 1987).
The Agency does not directly reimburse nursing homes for purchases of major movable equipment, including computer software, that costs more than $300. See Rule 560-X-22-.14(18), Ala. Admin. Code (Medicaid Agency). The Agency reimburses expenditures for major movable equipment under a "fair rental system" pursuant to Rule 560-X-22-.14(2), Ala. Admin. Code (Medicaid Agency). That rule provides:
"Effective September 1, 1991, a Fair Rental System will be used to reimburse property costs. The Fair Rental System reduces the wide disparity in the cost of capital payments for basically the same service and makes the cost of capital payment fairer to all participants in the program. The Fair Rental System is a rate of return on current asset values and will be used in lieu of depreciation and/or lease payments on land, buildings, and major movable equipment normally used in providing patient care."
The Agency does directly reimburse nursing homes for the cost of maintaining equipment, including computer software. See Rule 560-X-22-.10, Ala. Admin. Code (Medicaid Agency) (providing for direct reimbursement of "management and administrative costs," including costs for "data processing," see Rule 560-X-22-.10(3)(e), Ala. Admin. Code (Medicaid Agency)). The Medicaid regulations contain no definition of "maintenance."
The Agency acknowledges that, as a general proposition, software-maintenance fees are directly reimbursable as operating expenses. The Agency contends, however, that in the present case the fees labeled as "monthly software maintenance" were not routine maintenance expenses reimbursable as operating costs but were, instead, user fees or product upgrades that should be considered part of the overall purchase price of the product and reimbursed under the Agency's fair rental system.
The nursing home contends that the Agency had no reasonable justification for considering the monthly maintenance fees as capital expenditures rather than operating expenses. The nursing home insists *415 that, because the Medicaid regulations do not define "maintenance," the following circumstances are determinative in deciding whether the fees actually constituted maintenance costs: (1) all the evidence, including the testimony of the Agency's witnesses, indicated that the fees were for maintenance; (2) the contract between AHT and the nursing home classified the fees as "software maintenance"; and (3) according to Generally Accepted Accounting Principles ("GAAP"), the fees should be characterized as operating expenses for maintenance. We will consider those arguments in the order presented.

The Evidence
Jesse Loving, the director of the Agency's Provider Audit and Reimbursement Division, testified that the Agency denied reimbursement of the monthly maintenance fee because it concluded that the fee was really a user fee or a licensing fee that entitled the user to software "upgrades." He explained that an upgrade provided the user with a "new version" of a software program. Loving stated that, in deciding reimbursement issues, the Agency considered the American Hospital Association Guidelines, its own experience with computer software, and its longstanding interpretation of what constituted "software maintenance." He said that the Agency's historical definition of "software maintenance" is "an immediate fix to a problem." By way of explanation, Loving said that if "[a] program is not working properly, ... a technician who is familiar with that program either talk[s] to [the user] on the phone or come[s] out to the site and correct[s] any operating deficiencies in the program that may require some minor reprogramming."
AHT's vice president, Robert Baker, testified that a software-maintenance fee is "a monthly fee that we charge for any update that we apply to our system." Baker said that an update usually involved rewriting a line of code in the software to fix an application that was not working properly or to respond to a statutory or regulatory change. For example, he said that AHT updated its software to comply with privacy regulations enacted pursuant to HIPAA, the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d et seq.
Loving and Baker disagreed about whether the fee labeled as "monthly maintenance" covered "upgrades" or "updates." Loving insisted that the monthly fee encompassed upgrades, or new versions of AHT software programs. Baker maintained that the monthly fee encompassed only updates to the existing AHT software programs. We conclude that both witnesses were describing the same service, but using different terminology. We also conclude that the distinction, if any, between an "upgrade" and an "update" is too nebulous to serve as the basis for deciding the issue presented on this appeal.

The Terms of the Purchase Agreement
The purchase agreement provided, in pertinent part:
"2. Purpose of the Agreement

"This agreement provides for the purchase of hardware and related items, and the license of certain AHT programs detailed on Schedule A. These programs and related documentation may not be transferred or used by any other person, firm, or corporation without the prior written consent of AHT.
"3. Hardware and Software Costs

"The costs of hardware, manufacturer software, and the license fees for AHT application software are detailed on Schedule A.
"4. Other Costs

"....

*416 "Support fees after implementation will be charged at $83.00 per hour for application on-site and telephone support and $94.00 per hour for standard technical on-site and telephone support. Software maintenance fees will be $178.00 per month, payable in advance. Payment of the fee entitles the user to any updates to the program covered under this agreement and the first hour of support time each month. Unused support time for a particular month is not carried forward. The initial monthly payment will cover the maintenance period through the first full month after the system is installed. Software maintenance and support fees may be subject to state and local taxes.
"....
"The software maintenance fee is due for the length of time that the user uses the AHT software. The user's right to use this software and related material shall cease upon failure to make payment of the software maintenance fee. Such failure to make payment of this fee will constitute a termination of this agreement subject to the terms of Paragraph 10 of this agreement, if AHT so elects.
"....
"10. Term and Termination of this Agreement

"This agreement is effective until terminated.
"If any term or condition of this agreement is violated, in addition to enforcing other legal rights, AHT may terminate this agreement immediately by furnishing written notice of termination. Immediately upon receipt of the termination notice, the user agrees to destroy or return to AHT all copies (in whatever form) of all or any part of the programs and documentation in his possession or under his control.
"....
"The user further acknowledges that title to the programs and documentation is in and shall remain in AHT at all times."
Schedule A of the purchase agreement itemizes the products installed by AHT and the "other fees" covered by the agreement: Schedule A includes the following:

 "Installed Product (Itemized Below):
 "Software License and Implementation
 Fees................................... $14,950.00
 "Hardware................................. 16,299.00
 "Manufacturer Software ................... $ 1,793.00
 "Other Charges/Discounts ................. 1,832.00
 __________
 Total................................. $34,874.00
 "Other Fees:
 "Monthly NDDF (First Databank Drug
 Database) .................................. $ 96.00
 "Monthly software maintenance for additional
 modules .................................... 178.00
 "Monthly software maintenance for existing
 modules .................................... 83.00
 "Hourly rate for application on-site and telephone
 support .................................... 83.00
 "Hourly rate for technical on-site installation
 and telephone support ...................... 94.00
 "Hourly rate for technical initial on-site
 installation ............................... 66.00
 "....
 "Payment of fees entitles each additional licensed company
 to any updates in the programs covered under
 this Agreement and the first hour of support time each
 month."

The nursing home cites 42 C.F.R. § 413.130(b)(7) in support of its argument that, because the purchase agreement with AHT specifically designated a fee for monthly software maintenance, the Agency had no basis to classify the fee as anything other than "maintenance." 42 C.F.R. § 413.130(b)(7) provides:
"(7) Amounts included in lease or rental payments for repair or maintenance agreements are excluded from capital-related costs. If no amount is identified in the lease or rental agreement for maintenance, the entire lease payment is considered a capital-related *417 cost subject to the provisions of paragraph (b)(1) of this section."
(Emphasis added.)
The Agency contends that its reimbursement policies do not depend upon semantics and that it is not bound by the characterization of the charges in question as "monthly software maintenance fees." The Agency asserts that the way in which AHT arrived at the monthly maintenance fee is more indicative of how that fee should be characterized than what the fee is called. It points to the testimony of Robert Baker, the vice president of AHT, who, in responding to an inquiry concerning "how ... software maintenance fees are established," testified as follows:
"We establish maintenance fees for each module. We look at each module specifically and determine what the cost of updating that module is going to be.... [W]e estimate what it's going to take us to update those modules in the next year[ ] to come. Therefore we apply a factor, it's a mathematical factor to th[e] purchase price of the module to come up with a monthly software maintenance fee for that module."
Baker added,
"[D]ue to the regulatory environment that we're in, the changes we have to make to the application to stay in compliance with federal and state mandated regulatory issues, we have a team of 20 programmers based in our corporate office in Jackson, Mississippi; that's all they do is constantly make changes and modify the application to meet those regulatory guidelines."
The Agency asserts that the foregoing testimony demonstrates that the "monthly software maintenance fee" is really an additional cost of purchasing the product because it is a predetermined, mandatory payment required of all purchasers, based on a percentage of the purchase price.
The Agency also points to other portions of the purchase agreement that, it says, support the denial of reimbursement. Specifically, the Agency argues that because the monthly maintenance fee must be paid in advance, it is actually a part of the purchase price for equipment and not an operating expense. In addition, the Agency points out that paragraph 4 of the purchase agreement states that if the monthly maintenance fee is not paid, the user's rights under the contract cease:
"The software maintenance fee is due for the length of time that the user uses the AHT software. The user's right to use this software and related material shall cease upon failure to make payment of the software maintenance fee. Such failure to make payment of this fee will constitute a termination of this agreement subject to the terms of Paragraph 10 of this agreement, if AHT so elects."
The Agency contends that the foregoing provision means that, if the user does not pay the fee, then it cannot use the product. Therefore, the Agency reasons, the fee is part of the product, a component of the licensing agreement for the vendor's proprietary material.
When an administrative agency "`resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,'" it is acting in a judicial capacity. Kid's Stuff Learning Ctr., Inc. v. State Dep't of Human Res., 660 So.2d 613, 617 (Ala.Civ.App.1995)(quoting United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)). "[W]hen an administrative agency acts as a quasi-judicial body, it fulfills the same function as a court." Chisholm v. Defense Logistics Agency, 656 F.2d 42, 47 (3d Cir.1981). "To the extent that administrative *418 adjudications resemble courts' decisionsa very great extentthe law worked out for courts does and should apply to agencies." 4 Kenneth C. Davis, Administrative Law Treatise § 21:9 at 78 (2d ed.1983).
Thus, administrative agencies acting in their quasi-judicial capacities are, like courts, "not bound by the terminology of the parties to [an] agreement." In re Brackett, 259 B.R. 768, 774 (Bankr.M.D.Fla.2001)(holding that parties' characterization in divorce agreement of payments as alimony rather than property division was not controlling)(citing In re Freeman, 165 B.R. 307, 312 (Bankr.S.D.Fla.1994)(quoting In re Froman, 43 B.R. 609 (Bankr.S.D.Fla.1984))). See Getty Oil Co. v. Department of Energy, 749 F.2d 734, 737 (Temp.Emer.Ct.App.1984)(stating that "[a] regulatory agency is no more bound than is a court by the form in which regulated parties choose to cast a transaction, but may look beyond form to the economic substance, in order to further the regulatory purpose of Congress"); Black Butte Coal Co. v. United States, 38 F.Supp.2d 963, 968 n. 1 (D.Wyo.1999) (noting that "although the parties labeled their payments 'deferral charges,' the [administrative] agency must look to the substance of the agreement when determining whether a royalty should be issued, and is not bound by the parties' characterization of the payments"); and Dana's Housekeeping v. Butterfield, 807 P.2d 1218, 1220, 1221 (Colo.Ct.App.1991)(concluding that "[t]he determination of the operative facts as to whether a person is an employee or an independent contractor is generally within the province of the [administrative agency charged with deciding workers' compensation claims]," and thereby rejecting the argument that "the parties' characterization in the agreement that claimant was an independent contractor" should be given "determinative weight").
We recognize that the quoted passage from Professor Davis's treatise is contained within a discussion about whether the doctrine of res judicata applies to administrative decisions. That discussion, however, is applicable to other ways in which "the law worked out for courts does and should apply to [administrative] agencies." If that were not the case, then parties could, by the wording of their agreements, completely thwart the executive or legislative policy underlying administrative regulations. See, for example, Shuwa Investments Corp. v. County of Los Angeles, 1 Cal.App.4th 1635, 2 Cal.Rptr.2d 783 (1991), in which the court stated:
"`"[Taxpayers] cannot compel a court to characterize the transaction solely upon the basis of a concentration on one facet of it when the totality of circumstances determines its tax status. [A holding] that the parties' characterization is conclusive... would completely thwart the Congressional policy to tax transactional realities rather than verbal labels.... Otherwise, form, rather than substance, would invariably prevail."'"
1 Cal.App. 4th at 1655, 2 Cal.Rptr.2d at 794-95 (quoting Kuper v. Commissioner of Internal Revenue, 533 F.2d 152, 156 (5th Cir.1976)(citing Crenshaw v. United States 450 F.2d 472, 477-78 (5th Cir.1971))).
We agree with the Agency that the characterization in the purchase agreement of the fee at issue as a "monthly maintenance" charge is not determinative. We conclude that the Agency's reading of the purchase agreement as a wholerather than focusing on the single provision establishing a monthly software-maintenance feein order to determine how the fee should be characterized was reasonable. We also conclude that it was reasonable for the Agency to decide that a *419 monthly maintenance fee that must be paid in advance to avoid termination of the contract, that is based on a percentage of the purchase price, and that encompasses a periodic upgrade/update service provided for all users is in the nature of a "user fee" or a "licensing fee" that should be considered part of the purchase price of the product and, therefore, is a capital expenditure rather than an operating expense.

Generally Accepted Accounting Principles
The nursing home argues that the Agency's distinguishing between user-initiated software-maintenance fees (which it will reimburse) and vendor-initiated software-maintenance fees (which it will not reimburse) is arbitrary and capricious. Citing 42 C.F.R. § 413.130(b)(7), the nursing home points out that federal Medicaid regulations make no such distinctions. Instead, the nursing home says, those regulations provide that if a lease or purchase agreement specifically includes "[a]mounts... for repair or maintenance," then those amounts are excluded from capital-related costs. 42 C.F.R. § 413.130(b)(7) provides:
"(7) Amounts included in lease or rental payments for repair or maintenance agreements are excluded from capital-related costs. If no amount is identified in the lease or rental agreement for maintenance, the entire lease payment is considered a capital-related cost subject to the provisions of paragraph (b)(1) of this section."
At the fair hearing, the Agency acknowledged that in deciding reimbursement questions, it employs "Medicaid Reimbursement Principles." "Medicaid Reimbursement Principles" are defined in Rule 560-X-22-.03(4), Ala. Admin. Code (Medicaid Agency), as
"[a] combination of generally accepted accounting principles, principles included in the State Plan, Medicare (Title XVIII) Principles of Reimbursement, and procedures and principles promulgated by Medicaid to provide reimbursement of provider costs which must be incurred by efficiently and economically operated nursing facilities."
The nursing home presented evidence that a GAAP standard requires that, with regard to capital leases, executory costs such as maintenance fees are not a part of the capital lease. The fair-hearing officer accepted Don Maples, a certified public accountant with 30 years' experience in preparing cost reports for nursing homes, as an expert witness on Medicaid reimbursement issues. Maples testified that, according to GAAP, the monthly maintenance fee should have been considered a reimbursable operating expense. The nursing home argues that because the Medicaid regulations are silent with respect to the definition of "maintenance," Rule 560-X-22-.03(4) required the Agency to follow GAAP. Consequently, the nursing home says, the Agency's failure to follow GAAP means that its decision to deny reimbursement was unreasonable, arbitrary, and capricious.
The Agency correctly points out, however, that it is not required to follow GAAP if, in reaching a reimbursement decision, it relies on other reasonable standards. See North Shore Med. Ctr. v. Blue Cross and Blue Shield Ass'n/Blue Cross and Blue Shield of Florida, Case No. 93-0990 (United States Dep't of Health & Human Servs. Health Care Fin. Admin., Provider Reimbursement Review Bd., August 18, 1997)(noting that "[t]he requirement to consider GAAP is not a requirement to adopt GAAP. The Secretary has the authority to adopt regulations contrary to GAAP."). Here, the Agency relied on American Hospital Association Guidelines, the provisions of the purchase agreement *420 between AHT and the nursing home, and its own longstanding interpretation of the meaning of the term "maintenance" in relation to computer software.

Conclusion
The Agency determined that what was referred to as a "monthly maintenance fee" in the purchase agreement was not actually imposed for the expense of maintenance as that term is used in its regulations and, therefore, that the nursing home was not entitled to reimbursement. For the following reasons, we hold that the Agency's determination was not clearly erroneous, unreasonable, or arbitrary and capricious: Our standard of review requires that we take the Agency's order as prima facie just and reasonable. We cannot conclude that the nursing home established that the term "maintenance" had only one commonly understood meaning that was at odds with the Agency's interpretation. Cf. UDM Tech., Inc. v. Sterling Software (Southern), Inc., 225 Ga.App. 451, 453, 484 S.E.2d 3, 5 (1997)(noting that "software companies deal differently with the issue of whether product enhancements are to be included in a maintenance price or whether they are to be charged separately," and summarizing the testimony of a witness who suggested that the issue "depend[ed] on whether the upgrades are minor changes to address software problems or are major enhancements"). Thus, we hold that the nursing home's evidence did not rebut the presumption that the Agency's interpretation of its regulations was prima facie just and reasonable.[3]
"`Judicial deference is granted to decisions by administrative agencies because of their recognized expertise in specific specialized areas entrusted to them by the [L]egislature.'" Johnson v. Board of Control of the Employees' Retirement Sys. of Alabama, 740 So.2d 999, 1023 (Ala.1999)(quoting McRae v. General Retirement Sys. for Employees of Jefferson County, 536 So.2d 71, 72 (Ala.Civ.App. 1988)). "[A]n agency's interpretation of its own regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation." Ferlisi v. Alabama Medicaid Agency, 481 So.2d 400, 403 (Ala.Civ.App.1985).
The judgment of the Montgomery Circuit Court is affirmed.
AFFIRMED.
PITTMAN, J., concurs.
THOMPSON, J., concurs in the result, without writing.
BRYAN, J., concurs in the result, with writing.
MURDOCK, J., dissents, without writing.
BRYAN, Judge, concurring in the result.
The main opinion states:
"`To the extent that administrative adjudications resemble courts' decisionsa very great extentthe law worked out for courts does and should apply to agencies.' 4 Kenneth C. Davis, Administrative Law Treatise § 21:9 at 78 (2d ed.1983).
"Thus, administrative agencies acting in their quasi-judicial capacities are, like courts, `not bound by the terminology of the parties to [an] agreement.' In re Brackett, 259 B.R. 768, 774 (Bankr. M.D.Fla.2001) (holding that parties' *421 characterization in divorce agreement of payments as alimony rather than property division was not controlling) (citing In re Freeman, 165 B.R. 307, 312 (Bankr.S.D.Fla.1994) (quoting In re Froman, 43 B.R. 609 (Bankr.S.D.Fla. 1984)))."
986 So.2d at 418.
I believe that the above-quoted passage, and the case citations, parenthetical explanations, and related analysis immediately following the passage, are misleading and unnecessary to the resolution of this case. The sentence quoted from Kenneth Davis's Administrative Law Treatise"[t]o the extent that administrative adjudications resemble courts' decisionsa very great extentthe law worked out for courts does and should apply to agencies"is taken out of context by the main opinion.[4] In the section from which that sentence is taken, Davis comments on the doctrine of res judicata as it applies to administrative decisions:
"[The doctrine of res judicata] consists entirely of an elaboration of the obvious principle that a controversy should be resolved once, not more than once. The principle is as much needed for administrative decisions as for judicial decisions. To the extent that administrative adjudications resemble courts' decisionsa very great extentthe law worked out for courts does and should apply to agencies. Administrative action not resembling a judicial decision raises many unique and difficult problems of res judicata."
4 Kenneth C. Davis, Administrative Law Treatise § 21:9 at 78 (2d ed.1983). Clearly, in the sentence "[t]o the extent that administrative adjudications resemble courts' decisionsa very great extentthe law worked out for courts does and should apply to agencies," the word "law" merely refers to the doctrine of res judicata. Of course, the doctrine of res judicata is not an issue in the present case. As such, the use of the above-quoted sentence in the main opinion as a general statement of law is unwarranted and misleading, and it does not support the conclusion that "administrative agencies acting in their quasi-judicial capacities are, like courts, `not bound by the terminology of the parties to [an] agreement.'" 986 So.2d at 418 (quoting In re Brackett, 259 B.R. 768, 774 (Bankr. M.D.Fla.2001)).
I am concerned that the above-quoted sentences, taken out of context, may invite future misapplications of the law in administrative proceedings. There are important distinctions between administrative proceedings and judicial proceedings. For instance, Rule 81(b), Ala. R. Civ. P., provides that the Alabama Rules of Civil Procedure "are not applicable to any proceeding in which the adjudication of the controversy is ... by an administrative agency...." Although an appellate court may generally affirm a trial court's decision for any valid reason, see Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003), "[w]hen reviewing the decision of an administrative agency, ... an Alabama court will affirm only if the action and the stated basis for the action are correct." Ex parte Beverly Enters.-Alabama, Inc., 812 So.2d 1189, 1195 (Ala.2001).[5] I note also that the doctrine *422 of stare decisis applies to judicial decisions but generally does not apply to administrative decisions. "Because there is need for flexibility in administrative decisionmaking, the doctrine of stare decisis generally does not bind administrative agencies to their prior decisions. Thus, when inconsistent determinations are made by an administrative agency, the issue is whether the agency has acted in an arbitrary and capricious manner." Ex parte Shelby Med. Ctr., Inc., 564 So.2d 63, 68 (Ala.1990).
I agree with the conclusion in the main opinion that the Agency did not act in a clearly erroneous, unreasonable, or arbitrary and capricious manner and, therefore, that the judgment should be affirmed. However, because the main opinion contains superfluous and potentially misleading analysis, I must concur in the result.
NOTES
[1] A capital expenditure is "[a]n outlay of funds to acquire or improve a fixed asset." Black's Law Dictionary 222 (8th ed.2004).
[2] An operating expense is "[a]n expense incurred in running a business and producing output." Black's Law Dictionary 618 (8th ed.2004).
[3] A "prima facie" showing is one that is "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted." Black's Law Dictionary 1228 (8th ed.2004) (emphasis added).
[4] I note that this sentence is not found in subsequent editions of Administrative Law Treatise. See II Kenneth C. Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 13.3 (3d ed.1994); and II Richard J. Pierce, Jr., Administrative Law Treatise § 13.3 (4th ed.2002).
[5] As I stated in my writing in Combs v. Wade, 957 So.2d 464, 476 (Ala.Civ.App.2005) (Bryan, J., concurring in the result), rev'd on other ground, 957 So.2d 477 (Ala.2006) although I question the soundness of this principle, it is the law of this state until the supreme court changes it.